UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVEN POLNICKY,

    Plaintiff,

v.

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, et al.,

    Defendants.

Case No. 13-cv-01478-SI

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On June 9, 2014, the Court held a hearing on cross-motions for judgment filed by plaintiff Steven Polnicky and defendants Liberty Life Assurance Company of Boston ("Liberty Life") and Wells Fargo & Company Long Term Disability Plan ("the Plan"). Plaintiff brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.* to recover long-term disability ("LTD") benefits due to him under the terms of the Plan. On motion brought by plaintiff, this Court previously determined that the proper standard of review in this case is *de novo*. Docket No. 39, Order Grant. Pl.'s Mot. Summ. J. Nov. 18, 2013.

This order constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court GRANTS plaintiff's motion for judgment and DENIES defendants' motion for judgment.

**FINDINGS OF FACT**

**A. Parties**

    1.    Plaintiff Steven Polnicky, now thirty-three years old, was employed as a Reverse

Mortgage Consultant with Wells Fargo & Company ("Wells Fargo").  Docket No. 47-2, Paula McGee Decl., Ex. B, CF 0025-26.[1]  Plaintiff's resume states that he was the number one producer in the entire Wells Fargo Western Division and that he received top honors and awards for funding an average of thirteen loans per month for three million dollars in volume.  CF 0973.

2. Plaintiff suffers from back and neck pain in connection with an injury he suffered as a teenager.  CF 0672, 0988.  Plaintiff has since been diagnosed with spondylolisthesis, chronic lumbago, hamstring contractures, and generalized anxiety and mood disorders.  CF 0672, 0932, 1026.

3. Defendant Plan is an "employee welfare benefit plan" under 29 U.S.C. § 1002(1).  The Plan is established and sponsored by Wells Fargo for the benefit of its employees.  Docket No. 26-1, Paula McGee Decl., Ex. A, P 0001-44.[2]

4. Defendant Liberty Life insures LTD benefits provided by the Plan under a group disability income policy ("the Policy"), effective as of January 1, 2010.  P 0001-44.[3]  Liberty Life is also the claim administrator responsible for administering, processing, and paying claims for LTD benefits under the Plan.  *Id.*

5. Plaintiff was a covered participant in the Plan.  CF 0025-26.  Pursuant to the Policy, plaintiff began receiving LTD benefits from defendant on September 28, 2011, after submitting an LTD claim of work incapacity due to back pain.  CF 0025.  On June 1, 2012, Liberty Life terminated plaintiff's LTD benefits after determining that plaintiff was not disabled under the terms of the Policy.  CF 0658-63.

6. Plaintiff appealed Liberty Life's denial of benefits.  CF 0333-39.  On February 19, 2013, Liberty Life sent a letter to plaintiff denying the appeal and upholding its prior

---

[1] All further citations to documents bearing the bates range "CF___" refer to documents in the Claim File, which is Exhibit B to the McGee Declaration.

[2] All further citations to documents bearing the bates range "P___" refer to documents in the Policy, which is Exhibit A to the McGee Declaration.

[3] This Court previously determined that the controlling plan in this action is the Plan as it existed in 2013 when plaintiff's benefits were denied.  Docket No. 39, Order Grant. Pl.'s Mot. Summ. J. Nov. 18, 2013.

determination that plaintiff was not entitled to LTD benefits under the Policy.  CF 0034-46.

7. On April 2, 2013, plaintiff filed a complaint against defendants alleging a cause of action under 29 U.S.C. § 1132(a)(1)(B) to recover LTD benefits under the terms of the Plan. Docket No. 1, Compl. ¶ 1.

B. **Relevant Insurance Policy Provisions**

8. The Policy provides that Liberty Life will pay a monthly benefit to an employee insured under the Plan if, in relevant part, Liberty Life receives proof of continued disability after a six-month "Elimination Period."  P 0022.  The monthly benefit ceases if the employee fails to provide proof of continued disability.  P 0030.

9. The Policy defines "Disability" to mean "that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness,[4] is unable to perform the Material and Substantial Duties of his Own Occupation."  P 0008.  After the 24-month period, the Covered Person is disabled if he or she "is unable to perform, with any reasonable continuity, the Material and Substantial Duties of Any Occupation."  *Id.*  Plaintiff's LTD benefits were terminated within the 24-month period.  CF 0025.

10. The Policy defines "Material and Substantial Duties" to mean "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot reasonably be eliminated or modified."  P 0011.

11. The Policy defines "Own Occupation" to mean the claimant's occupation "that he was performing when his Disability or Partial Disability began.  For purposes of determining Disability under this policy, Liberty Life will consider the Covered Person's occupation as it is normally performed in the local economy."  P 0012.

---

[4] **Error! Main Document Only.** The Policy defines "Injury" to mean "bodily impairment resulting directly from an accident and independently of all other causes."  P 0011.  For the purpose of determining benefits under the Plan, an injury is treated as a "Sickness" if the disability begins more than sixty days after the injury or if the injury accounts for a medical condition that arises while the employee is covered under the Plan.  *Id.*

3

### C. Plaintiff's Occupation

#### a. Wells Fargo Job Description

12. A job description provided by Wells Fargo to Liberty Life during its short-term disability ("STD") claim investigation described plaintiff's occupation as "Reverse Mortgage Consultant." CF 1177. The description stated the following: the job was an eight-hour per day, forty-hour per week position, and job responsibilities included "soliciting reverse mortgages from various sources including realtors, builders, financial professionals, past customers and other nontraditional sources." *Id.* The job required constant (six to eight hours per day) repetitive hand use; frequent (three to six hours per day) sitting and grasping; occasional (thirty minutes to three hours per day) walking, standing, bending, and fine hand manipulation; and seldom (up to thirty minutes per day) squatting, twisting, pushing, pulling, and reaching. *Id.* The employee was also occasionally required to lift or carry up to ten pounds and to drive a motor vehicle. CF 1178. The job involved face-to-face, telephonic, and online contact with customers. *Id.*

#### b. Liberty Life's Occupational Analysis[5]

13. In its denial of plaintiff's LTD benefits, Liberty Life relied upon an Occupational Analysis ("OA") report written by a vocational case manager employed by Liberty Life. CF 0662. The case manager was instructed to present the physical aspects of the occupation. CF 0997.

14. The OA report distinguished between "light" and "sedentary" work classifications. CF 1000. According to the OA report, the Department of Labor classifies "light" work as work

---

[5] The Court grants plaintiff's request to consider the following extrinsic evidence: the Dictionary of Occupational Titles definition of "Sales Representative, Financial Services," Appendix C to the Dictionary of Occupational Titles, and the O*Net description of "Sales Representative, Financial Services." Docket No. 48-1, Corinne Chandler Decl., Ex. A-C. Both of these documents were referenced in Liberty Life's Occupational Analysis report. The Court denies plaintiff's request to consider plaintiff's Social Security award. *Id.*, Ex. D. Plaintiff's Social Security award is irrelevant to Liberty Life's termination of LTD benefits because the award was issued after plaintiff's appeal was denied. In addition, Liberty Life is not bound by determinations made by the Social Security Administration. *See Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1286 (9th Cir. 1990); *Hoskins v. Bayer Corp. & Bus. Servs. Long Term Disability Plan*, 564 F. Supp. 2d 1097, 1105 (N.D. Cal. 2008) *aff'd*, 362 F. App'x 750 (9th Cir. 2010).

requiring physical demands "in excess of those [required] for Sedentary Work," including "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds frequently, and/or a negligible amount of force constantly . . . to move objects." CF 0999. In contrast, "sedentary" work is defined as work that involves "sitting most of the time, but may [also] involve walking or standing for brief periods of time." CF 1000. The OA report added, "[t]hose that may meet with clients primarily in a bank setting where clients come in for services would be considered sedentary. Those that travel to meet their customers and do presentations could be considered light." *Id.*

15. The OA report determined that plaintiff's occupation as a "Reverse Mortgage Consultant" was most consistent with the occupation of "Sales Representative, Financial Services," as defined by the Dictionary of Occupational Titles ("DOT"). *Id.* According to the DOT, the occupation of financial services sales representative was most typically performed in the light work classification. CF 0999. The DOT describes the job duties of a "Sales Representative, Financial Services" to include, *inter alia*, selling financial services to customers of financial institutions, developing prospects from commercial customers, and contacting prospective customers to present information on available services. CF 0998.

16. The OA report also referenced the Occupational Information Network ("O*Net") and the Occupational Outlook Handbook ("OOH"). CF 0998. O*Net offered a sample of job titles consistent with the occupational title of "Sales Agent, Financial Services," such as "Financial Consultant" and "Financial Specialist." *Id.* OOH stated that financial services sales agents normally work forty hours a week in a comfortable office environment. *Id.* However, according to OOH, sales agents "may spend considerable time outside the office, meeting with current and prospective clients, and attending civic functions." *Id.*

17. Based upon the case manager's review of the DOT, O*Net, OOH, and online job listings, the OA report concluded that "ample opportunities exist" for plaintiff to perform his occupation in *either* the light and sedentary work classifications. CF 1000. According to the OA report, this conclusion was consistent with how the occupation was performed in both the national

and local economy. CF 0999.

18. The vocational case manager also prepared an addendum to her OA report addressing the availability of sit/stand options for individuals performing plaintiff's occupation in a sedentary capacity. CF 0923-26. The vocational case manager suggested a variety of office enhancements that would allow plaintiff to sit or stand at a desk while preserving continuous work flow. CF 0925.

### c. Plaintiff's Employability Analysis and Work Calendar

19. In his appeal of Liberty Life's termination of his LTD benefits, plaintiff submitted an Employability Analysis ("EA") report prepared by an outside vocational expert. CF 0333-39. The EA report concluded that plaintiff was restricted to the sedentary work category based upon a review of plaintiff's medical records. CF 0339. According to the vocational expert, however, plaintiff could not adhere to such restrictions because plaintiff's occupation required him to regularly travel out of the office. CF 0338. Plaintiff could not utilize "ergonomic equipment" to perform his occupation because much of plaintiff's job occurred in locations where ergonomic equipment could not be used. CF 0338-39. As such, the EA report concluded that plaintiff was "unable to perform the duties of own occupation." CF 0339.

20. In connection with his appeal, plaintiff also submitted his personal work calendar for February 2013, the month before he began receiving disability benefits. CF 0282-0309. The calendar indicated that he regularly traveled out of the office to attend open houses, conduct presentations, deliver loan documents, meet with realtors, meet with clients, and attend escrow closings. *Id.*

### D. Plaintiff's Medical Condition and Treatment

21. Plaintiff stated that he injured his lower back during a skateboarding accident that occurred when he was a teenager, an injury that continues to cause him pain. CF 0672, 0988. As a result of his injury, plaintiff underwent a laminectomy of his lower spine and a spinal fusion in

2006. CF 0672. Plaintiff was also treated with physical therapy and back braces. CF 0672, 0934, 1026. Plaintiff was ultimately diagnosed with spondylolisthesis, chronic lumbago, hamstring contractures, and generalized anxiety and mood disorders. CF 0672, 0932, 1026.

22. Beginning in February 2011, plaintiff consulted with five doctors to treat his neck and back pain. CF 0957-58. Plaintiff stated that he was able to stand for only ten to fifteen minutes without interruption, and that he was able to sit for only thirty to forty-five minutes without interruption. CF 0672, 0934, 0968. After one of the doctors confirmed that plaintiff had nerve damage in his back, other doctors prescribed plaintiff pain relief medication, steroidal injections, and various methods of physical therapy. CF 0230-57, 1026-27, 1086. Plaintiff's description of his pain is consistent with the findings of nerve damage, as verified by medical literature contained within the record. CF 0310-31.

23. Plaintiff advised the doctors that he suffered emotional effects related to his illness, including anger, anxiety, depression, sadness, social avoidance, panic, disagreeability, moodiness, and irritability. CF 0672.

### E.     Plaintiff's Short Term Disability Benefits

24. On March 30, 2011, plaintiff submitted a claim for STD benefits to Liberty Life. CF 0023. Plaintiff informed Liberty Life that his disability benefits claim was due to the back pain that he had been experiencing for fifteen years and that was now becoming unbearable. *Id.* He stated that had not suffered any injury since his spine surgery in 2006. *Id.*

25. Based on its review of the records obtained from plaintiff, Liberty Life ultimately approved plaintiff's STD claim through September 27, 2011, the maximum six-month period of time for STD benefits. CF 0012. Wells Fargo's STD benefits plan was a separate plan funded by Wells Fargo. McGee Decl. ¶ 6. Liberty Life acted solely as a claims manager for plaintiff's STD claim and was not obligated to pay any benefits to plaintiff before a six-month "Elimination Period." *Id.*

7

**F.      Liberty Life's Long Term Disability Claim Investigation**

26.     After exhaustion of the six-month "Elimination Period" of STD benefits on September 28, 2011, plaintiff's disability benefits coverage fell under Liberty Life's LTD Policy. *See* McGee Decl. ¶ 6.  Under the Policy, LTD benefits were paid from Liberty Life, rather than from Wells Fargo. *Id.*

27.     On August 12, 2011, Liberty Life began its investigation of plaintiff's claim for LTD benefits under the Plan. CF 0010.  Liberty Life's LTD claim review included a review of all of the records and information obtained in the STD claim.  McGee Decl. ¶ 8.  Liberty Life informed plaintiff that he would continue to receive LTD benefits during Liberty Life's claim review. CF 0882.  Plaintiff's gross monthly benefit was $11,295.24. CF 0883.

          a.      **Video Surveillance**

28.     In connection with its LTD claim investigation, Liberty Life ordered three days of surveillance from Horsemen Investigations to observe and document plaintiff's activity level.  CF 0008, 0645.  An investigator surveilled plaintiff for over twenty-four hours over three days, but reported observing plaintiff outside of his residence only once. CF 0946-53.  The five minutes of video obtained by the investigator showed the following: on the morning of August 18, 2011, plaintiff left his residence, drove his vehicle, and walked on a local forest trail for approximately forty-five minutes.  CF 0948-49.  Plaintiff then returned to his residence, where he remained indoors until the investigator ended his surveillance for the day. CF 0949.  The investigator did not observe plaintiff leaving his residence at all during surveillance conducted on August 23, 2011 and August 29, 2011.  CF 0951, 0953.

28.     Shortly after receipt of a psychiatric evaluation report completed by Dr. Marc A. Cohen, discussed below, Liberty Life ordered an additional three days of surveillance of plaintiff from Horsemen Investigations. CF 0005, 0823.  When he was surveilled on January 19, 2012 and January 20, 2012, plaintiff was not observed leaving his residence at all. CF 0811-14.  On January 29, 2012, an investigator observed plaintiff walking a dog on a local forest trail for approximately

an hour. CF 0815-18. The investigator reported that plaintiff appeared to run down a hill as the dog "out ran" him. CF 0817. Plaintiff then returned to his residence and was not observed leaving for the rest of the day. CF 0817-18.

29. On February 16, 2012, Liberty Life ordered a final round of surveillance from Horsemen Investigations. CF 0005. Plaintiff was surveilled for seventeen hours on March 1, 2012, and March 3, 2012, but was not observed leaving his residence. CF 0723-28.

### b. Medical Examinations

30. On September 9, 2011, Dr. Gale Brown, a medical reviewer for Liberty Life, reviewed plaintiff's medical record. CF 0932. Dr. Brown confirmed that each of plaintiff's diagnoses was supported by medical evidence. *Id.* She acknowledged that plaintiff's spondylolisthesis and spinal stenosis could be expected to cause pain related to prolonged standing, while plaintiff's disk herniation could explain pain related to prolonged sitting. *Id.* In addition, plaintiff's severe hamstring contractures were "undoubtedly" contributing to his mechanical back pain. *Id.* However, Dr. Brown concluded that plaintiff could return to sedentary work with an ergonomic work station that permitted sitting and standing positions at will. *Id.* After reviewing the video surveillance recorded by Horsemen Investigations, Dr. Brown also concluded that plaintiff's behavior demonstrated "substantial physical ability." CF 0806. Dr. Brown's review did not address plaintiff's psychological condition.

31. Liberty Life ordered two psychiatric examinations of plaintiff from Park Dietz & Associates, Inc. ("Park Dietz"). On November 14, 2011, Dr. Daniel A. Martell conducted "psychodiagnostic testing" of plaintiff. CF 0850. Dr. Martell reported that plaintiff's psychodiagnostic profile was produced by patients who are experiencing "significant agitation, depression, and anxiety." CF 0854. Dr. Martell attributed plaintiff's depression and anxiety to his "adaptation to chronic back pain." CF 0856.

32. On December 5, 2011, Dr. Cohen, also of Park Dietz, conducted a psychiatric evaluation of plaintiff. CF 0828. After interviewing plaintiff about his medical, family, social,

educational, and employment history, Dr. Cohen concluded that plaintiff did not suffer from a mental or cognitive disorder that would preclude him from returning to work. CF 0849. In response to questions posed by Liberty Life, Dr. Cohen reported "some evidence that feelings of entitlement may be associated with [plaintiff's] claim of work incapacity." CF 0848. However, Dr. Cohen also reported finding "little evidence, if any" that factors associated with personal choice or secondary gain were related to plaintiff's work incapacity. *Id.* Dr. Cohen stated that plaintiff's claim of work incapacity was likely related to an Avoidant Personality Disorder. *Id.* Dr. Cohen described Avoidant Personality Disorder as "a pervasive pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation." CF 0845.

33. On May 1, 2012, Dr. Mark Bernhard conducted an independent medical examination and interview of plaintiff. CF 0671-85. Dr. Bernhard concluded that plaintiff could sit in an ergonomic chair with periodic breaks for stretching, standing, spine rotation, and flexion every twenty minutes, while taking shorter five to ten second breaks in between. CF 0684. Dr. Bernhard also recommended that plaintiff lie down once a day for ten to fifteen minutes during lunch breaks or for a few minutes during regularly scheduled breaks. CF 0685. Dr. Bernhard stated that, with these accommodations, plaintiff "would be able to engage in a full range of sedentary activities [while] avoiding bending, twisting, or turning." CF 0684. Plaintiff would be restricted to lifting no more than ten pounds. *Id.*

### G.     Liberty Life's Termination of Plaintiff's LTD Benefits

34. On June 1, 2012, Liberty Life informed plaintiff that his LTD benefits were being terminated after Liberty Life determined that plaintiff was capable of performing full-time sedentary work and no longer met the Policy's definition of disability. CF 0658-63. Liberty Life's decision acknowledged plaintiff's "current restrictions and limitations due to [his] disabling condition." CF 0658. Nevertheless, Liberty Life concluded that plaintiff possessed an "overall ability" to perform his occupation at a sedentary capacity with a sit/stand option. CF 0662. According to Liberty Life, plaintiff's "restrictions and/or limitations would not alter the

requirements for your occupation." *Id.* Plaintiff's LTD claim was closed on May 28, 2012. *Id.*

### H. Plaintiff's Appeal and Liberty Life's Decision to Uphold the Termination of Plaintiff's LTD Benefits

35. On November 27, 2012, with the assistance of counsel, plaintiff submitted a written request to appeal Liberty Life's termination of his LTD benefits. CF 0601-10. Plaintiff's letter contended that plaintiff's occupation was performed at the light physical demand level, as evidenced by the EA report and plaintiff's work calendar. CF 0603.

36. In connection with his appeal, plaintiff submitted the results of an independent medical examination conducted by Dr. Ronald B. Perelman on November 1, 2012. CF 0074-94. Based upon plaintiff's medical history and his own examination of plaintiff, Dr. Perelman concluded that plaintiff could engage in sedentary work, but could only sit for twenty minutes at a time while walking for at least ten minutes every hour. CF 0081. Dr. Perelman recommended that plaintiff refrain from bending, stooping, and lifting more than fifteen pounds. *Id.*

37. On January 11, 2013, Liberty Life referred plaintiff's claim file to Dr. Jamie Lewis for a peer review of plaintiff's medical records. CF 0064. Based upon a review of Liberty Life's records related to plaintiff's claim, Dr. Lewis summarized plaintiff's previous medical examinations and concluded that plaintiff had "no focal weakness" despite decreased muscle strength throughout his back. CF 0061. According to Dr. Lewis, plaintiff was capable of working "unrestricted hours at a full time capacity . . . with restrictions of lifting and carrying 20 pounds occasionally and 10 pounds frequently." *Id.* Plaintiff would not need to be restricted to sitting, walking, and standing, but instead could have "unrestricted use of fine motor movements to the upper extremities." *Id.*

38. On February 19, 2013, Liberty Life informed plaintiff that it was upholding its decision to terminate plaintiff's LTD benefits. CF 0034-46. Liberty Life again acknowledged plaintiff's "symptoms associated with his long-standing condition." CF 0045. Nonetheless, Liberty Life concluded that the record did not establish that plaintiff's symptoms "were of such a severity that they resulted in restrictions or limitations rendering him unable to perform the

11

material and substantial duties of his occupation as it is normally performed in the local economy." *Id.* Liberty Life closed plaintiff's administrative claim with no further review. CF 0046.

# CONCLUSIONS OF LAW

## A. Standard of Review

39. The applicable standard of review for Liberty Life's denial of LTD benefits to plaintiff is *de novo*. Docket No. 39, Order Grant. Pl.'s Mot. Summ. J. Nov. 18, 2013.

40. When conducting *de novo* review of a decision by an ERISA plan administrator, the Court has a responsibility to undertake an independent and thorough inspection of the decision. *See Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006). The Court then "proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).

41. In reviewing the plan administrator's decision, the Court has discretion to allow evidence that was not before the plan administrator, but "only when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 944 (9th Cir. 1995).

42. When construing terms of the Plan, the Court must "apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws." *Dupree v. Holman Professional Counseling Centers*, 572 F.3d 1094, 1097 (9th Cir. 2009). Under California law, the Court must construe each provision of the Plan "in a manner consistent with the whole such that none is rendered nugatory." *Id.* (citing Cal. Civ. Code § 1641).

43. In California and in virtually every other jurisdiction in the country, ambiguities in insurance contracts must be construed against the insurer. *Lang v. LTD Benefit Plan*, 125 F.3d 794, 799 (9th Cir. 1997) (citing *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir.

1990)). This rule, known as the doctrine of *contra proferentem*, extends to ERISA policies. *Id.*

44. Here, the Court must determine whether plaintiff is disabled within the meaning of the Plan, as required for continued receipt of LTD benefits from Liberty Life. *See Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1298 (9th Cir. 2010). Plaintiff bears the burden of proving that he is entitled to LTD benefits under the terms of the Policy. *Id.* at 1294 ("[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant.").

45. The parties' cross-motions for judgment focus on two main issues. First, whether Liberty Life applied the correct definition of "Own Occupation" under the terms of the Policy. Second, whether plaintiff met his burden of proof in establishing that he was disabled from performing his "Own Occupation."

### B.     Liberty Life's Classification of Plaintiff's "Own Occupation" as Sedentary

46. Liberty Life contends that it properly terminated plaintiff's LTD benefits because, based upon plaintiff's medical records, plaintiff was capable of performing full-time sedentary work and thus was not disabled under the terms of the Policy. Docket No. 47, Defs.' Mot. at 23. Pursuant to the Policy, plaintiff is considered disabled only if he is unable to perform the "Material and Substantial Duties of his Own Occupation." P 0008. In its termination of plaintiff's LTD benefits, Liberty Life characterized plaintiff's "Own Occupation" as sedentary because, according to Liberty Life's OA report, there were "ample opportunities" in the local economy to perform plaintiff's occupation at *both* the sedentary and light physical demand levels. CF 0662. Liberty Life thus classified plaintiff's occupation as sedentary because it *could* be performed in such a manner. After also determining that plaintiff was physically capable of performing full-time sedentary work (with a sit/stand option), Liberty Life concluded that plaintiff could perform the duties of his "Own Occupation" and was no longer entitled to LTD benefits. *Id.*

47. Plaintiff contends that Liberty Life's occupational analysis is deficient because Liberty Life did not consider plaintiff's actual job duties at Wells Fargo as required by the terms

13

of the Policy. Docket No. 51, Pl.'s Mot. at 4. Plaintiff argues that his occupation required substantial out of office duties, placing it in the light physical demand level. *Id.* at 5.

48. The Court agrees with plaintiff and finds that Liberty Life incorrectly applied the definition of "Own Occupation" under the terms of the Policy. The Policy defines "Own Occupation" to mean the plaintiff's occupation "that he was performing when his Disability or Partial Disability began. For purposes of determining Disability under this policy, Liberty Life will consider the Covered Person's occupation as it is normally performed in the local economy." P 0012. Liberty Life emphasizes the second sentence of this definition, relying on the OA report's conclusion that "Sales Representative, Financial Services"—an occupation that "most closely represent[s]" plaintiff's occupation—existed at the sedentary level within the local economy. CF 0999. However, defendants completely disregard the first sentence of the definition, which states that "Own Occupation means the Covered Person's occupation *that he was performing* when his Disability or Partial Disability began." P 0012. (Italics added.) For purposes of determining plaintiff's disability, Liberty Life was permitted to also consider his occupation "as it is normally performed in the local economy." *Id.* However, under the plain language of the Policy, Liberty Life could not simply ignore plaintiff's actual job duties at Wells Fargo and define his "Own Occupation" solely by reference to how the position of "Sales Representative, Financial Services" *could* be performed in the local economy. *See Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 385-86 (3d Cir. 2003) (holding that claimant's "'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability," and that plan administrator impermissibly defined "regular occupation" by reference to how that job was performed in the general economy); *Rodden v. Jefferson Pilot Fin. Ins. Co.*, 591 F. Supp. 2d 1113, 1124 (N.D. Cal. 2008) (finding that policy's definition of "Own Occupation" required insurer to consider covered person's actual job duties even if it also allowed insurer to consider "similar duties" that could be performed with any other employer). In California, "[t]he whole of a contract must be read together, so as to give effect to every part, if reasonably practicable[.]" Cal. Civ. Code § 1641. The Court must not interpret contracts in a way that "renders some clauses

14

nugatory, inoperative or meaningless." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 473 (1998). Liberty Life's interpretation of "Own Occupation" would require the Court to disregard the first sentence of the "Own Occupation" definition as stated in the Policy.

49. In terminating plaintiff's benefits, Liberty Life relied upon the OA report's conclusion that plaintiff's occupation existed at the sedentary level in the local economy. CF 0662. Based on the evidence in the record, however, the job duties required for plaintiff's occupation were actually performed at the light level. Plaintiff's occupation required substantial out-of-office travel. A Wells Fargo job description for plaintiff's occupation stated that plaintiff was responsible for soliciting loans from "nontraditional sources," including realtors, builders, financial professionals, and past customers. CF 1177. These nontraditional sources required plaintiff to travel outside of the office, as solicitation often involved face-to-face contact. *Id.* The job also required occasional (thirty minutes to three hours per day) walking, standing, bending, and lifting of objects up to ten pounds, as well as the ability to drive motor vehicles. CF 1177-78. Plaintiff's personal work calendar for February 2013, the month before he began receiving STD benefits, indicated that he regularly traveled out of the office to attend open houses, conduct presentations, deliver loan documents, meet with realtors, meet with clients, and attend escrow closings.[6]  CF 0282-0309.

50. Notably, the classification of plaintiff's occupation within the light physical demand level is not inconsistent with how the occupation was performed in the local economy. The OA report itself recognizes that persons performing plaintiff's occupation who "travel to meet their customers and do presentations could be considered light."  CF 1000. The DOT's definition of "Sales Representative, Financial Services" stated that plaintiff's occupation was "most typically performed" at the light physical demand level. CF 0999. The OA report added that, based upon its review of O*Net and OOH, plaintiff's occupation "also exists in the sedentary work

---

[6] Pursuant to a Wells Fargo agreement signed by plaintiff, plaintiff was subject to termination if he did not meet the company's minimum production threshold requirements. CF 0340.

classification." *Id.* However, O*Net merely offered a sample of similar job titles, such as "Financial Consultant" and "Financial Specialist," with no discussion of specific duties associated with those occupations. *Id.* OOH stated that financial services sales agents normally work forty hours a week in an office environment, but "may spend considerable time outside the office, meeting with current and prospective clients, and attending civic functions." *Id.*

**C.     Plaintiff's Disability**

51 .     The record demonstrates that when plaintiff's condition is evaluated in connection with his actual job duties at Wells Fargo, plaintiff was unable to perform the material and substantial duties of the Mortgage Consultant position, and thus entitled to benefits under the Plan. It is undisputed that plaintiff is diagnosed with spondylolisthesis, chronic lumbago, and hamstring contractures, as well as generalized anxiety and mood disorders. These diagnoses were confirmed by plaintiff's physicians, independent medical examiners, and even Liberty Life's own medical reviewer, Dr. Brown. The Court finds it significant that no physician cited in the record has disputed plaintiff's diagnosis or his pain with sitting and standing. Dr. Brown, for instance, reported that spondylolisthesis and disk herniation could be expected to cause plaintiff's pain related to prolonged standing and sitting, while his severe hamstring contractures were "undoubtedly" contributing to his mechanical back pain. CF 0932. Dr. Bernhard, an independent medical examiner hired by Liberty Life, explicitly concluded that plaintiff "certainly . . . has pathology, [an] injury which is documented not only surgically but on MRI, CT scan, x-ray, . . . [and] EMG findings supporting the claimant's alleged pain complaints and back symptoms." CF 0684. With respect to plaintiff's cognitive diagnoses, Dr. Martell attributed plaintiff's apparent depression and anxiety to his "chronic back pain." CF 0856. Dr. Cohen reported that plaintiff demonstrated features of Avoidant Personality Disorder. CF 0848. Plaintiff's condition is consistent with the video surveillance ordered by Liberty Life, in which investigators ultimately observed plaintiff leaving his residence only twice–briefly–within a total of eight days. CF 0723-

28, 0811-18, 946-53.[7]

52. Liberty Life relies upon medical reports stating that plaintiff is capable of performing full-time sedentary work with certain restrictions and accommodations (e.g., a sit/stand option).[8] As established above, however, plaintiff's actual job duties were performed at the light physical demand level, a finding consistent with how his occupation was performed in the local economy. By itself, Liberty Life's conclusion that plaintiff could perform full-time *sedentary* work does not mean that plaintiff was capable of performing the material and substantial duties of his "Own Occupation." *See Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) (denial of benefits based upon a finding that claimant could perform sedentary work was erroneous because "simply being able to perform sedentary work does not necessarily enable one to work" in an occupation that requires "careful thought and concentration"). To the contrary, the record shows that plaintiff's condition rendered him unable to perform the out-of-office duties required for his occupation.

## CONCLUSION

For the foregoing reasons, the Court GRANTS plaintiff's motion for judgment and DENIES defendants' motion for judgment. The Court reinstates plaintiff's benefits from the date of termination through the end of the 24-month "Disability" period. The Court remands this case to the Plan for a determination of plaintiff's eligibility for LTD benefits after expiration of the 24-month period.

The parties shall meet and confer to determine whether a further judgment is required at

---

[7] In his claim for LTD benefits, plaintiff stated that he goes outdoors once daily to "try to go walking." CF 0970. He reported that his daily routine involved leaving his residence only for "light walking" or to attend physical therapy and doctor appointments. CF 0971.

[8] Dr. Brown concluded that plaintiff was restricted to sedentary work (with a sit/stand option) as a result of his medical condition. CF 0932. Dr. Bernhard, an independent medical examiner who interviewed plaintiff, concluded that plaintiff "would be able to engage in a full range of sedentary activities [while] avoiding bending, twisting, . . . turning" or lifting more than ten pounds. CF 0684. Even in a sedentary capacity, plaintiff would need to take periodic breaks to stretch or lie down. CF 0684-85.

17

this time and, if so, to propose a form of judgment consistent with these Findings of Fact and Conclusions of Law.

**IT IS SO ORDERED**.

Dated: November 25, 2014

SUSAN ILLSTON
United States District Judge